IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RICHARD GERBER,                          )
                                         )
          Petitioner,                    )
                                         )
     v.                                  )    Case No. 1:06-mc-00032-RJL
                                         )
UNITED STATES OF AMERICA,                )    Hon. Richard J. Leon
                                         )
          Respondent.                    )

## DECLARATION OF RICHARD G. JACOBUS

Pursuant to 28 U.S.C. §1746(1), Richard G. Jacobus declares:

1.      I am employed as a trial attorney for the Tax Division of the United States Department of Justice in Washington, D.C.

2.      As part of my duties in this position, I have been assigned litigation responsibility for the above-captioned matter.

3.      This Declaration is submitted in support of the United States' Motion to Dismiss Petition to Quash IRS Summons and Petitioner's Supplemental Memorandum of Points and Authorities, filed concurrently with this Declaration.

4.      On or about March 20, 2006, I accessed the publicly available electronic case filing system (CM/ECF) of the U.S. District Court for the District of Utah, and obtained copies of certain documents filed in SEC v. Merrill Scott & Associates, Ltd., et al., Civil No. 2:02-cv-0039-TC-DON (D. Utah), true and accurate copies of which are annexed hereto as Exhibits 1, 2, and 3, as follows:

| Exhibit 1 | Memorandum in Opposition to Receiver's Motion for Consolidation of Frozen Assets, filed by Richard Gerber on October 20, 2003 (docket No. 181). |
| Exhibit 2 | Objection to Protective Order, filed by certain "Property Owners," including Richard Gerber, on December 8, 2004 (docket No. 388). |
| Exhibit 3 | Order filed December 21, 2004 (docket No. 397). |

1602505.1

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 20, 2006.

RICHARD G. JACOBUS

1602505.1

Mark J. Griffin #4329
Nicholas E. Hales #4045
P. Corer James #8960
**WOODBURY & KESLER, P.C.**
265 East 100 South, Suite 300
P. O. Box 3358
Salt Lake City, Utah  84110-3358
Telephone:  (801) 364-1100



Attorneys for Richard Gerber

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MERRILL SCOTT & ASSOCIATES, LTD; MERRILL SCOTT & ASSOCIATES, INC.; PHOENIX OVERSEARS ADVISORS, LTD; PATRICK M. BRODY; DAVID E. ROSS II; and MICHAEL G. LICOPANTIS,<br><br>Defendants. | **MEMORANDUM IN OPPOSITION TO RECEIVER'S MOTION FOR CONSOLIDATION OF FROZEN ASSETS**<br>**(Oral Argument Requested)**<br><br><br>Civil No. 2:02 CV-0039C<br>Judge Tina Campbell<br>Magistrate Judge David Nuffer |





1

TABLE OF CONTENTS

INTRODUCTION...........................................................................................3

STATEMENT OF FACTS............................................................................3

ARGUMENT..................................................................................................9

    GENERAL STATEMENT.........................................................................9

I.     THE DARK AMETHYST ASSETS ARE NOT PART OF THE RECEIVERSHIP ESTATE NOR SHOULD THEY BE SUBJECT TO THIS COURT'S ORDER FREEZING ASSETS...................................................................9

    A.    No Evidence of MSA ownership interest.......................................11

    B.    The DA Assets are not "tainted".................................................11

        i.    Neither Dr. Gerber nor the DA Assets were involved in Ponzi wrongdoing........................................................................11

        ii.   The Receiver has failed to present any evidence demonstrating that the DA Assets played a part in the "Ponzi" scheme...............................................................................12

II.    THE RECEIVER'S INTERPRETATION OF THE ORDER IS TOO BROAD-THE RECEIVER HAS FAILED TO PROVE THAT THE DA ASSETS SHOULD FALL WITHIN THE RECEIVERSHIP ESTATE .........................................................................................................15

III.   THE RECEIVER'S ACTIONS ARE PREMATURE.................................17

IV.   THE GRANTING OF RECEIVER'S REQUEST VIOLATES DUE PROCESS...................................................................................................19

V.    EQUITY DICTATES THAT THE DA ASSETS SHOULD BE LEFT OUT OF THE CONSOLIDATION....................................................................21

## INTRODUCTION

The Receiver seeks consolidation of frozen assets in which Dr. Richard Gerber has an interest. The frozen assets are certain real estate limited partnerships, held by Dark Amethyst, LLC, a company set up by MSA for the benefit of Dr. Gerber. Dr. Gerber contends that the assets are not properly part of the receivership estate, nor subject to consolidation or liquidation. Receiver does not contest Dr. Gerber's beneficial ownership of the DA Assets, but instead asserts that MSA "controls" the property, and for that reason, by this court's order, the property becomes part of the receivership estate.

Dr. Gerber contends the case law is contrary: mere "management" does not equate to "control". Moreover, the Receiver has proposed no plan for determining assets belonging to the receivership estate or determining which assets of clients ought to continue to be frozen. Without such a plan, and notice, and opportunity for hearing on plan components, Dr. Gerber asserts that the Receiver's position tantamount to conversion and must not be sanctioned by the Court.

## STATEMENT OF FACTS

It is difficult for Dr. Gerber to respond to the Receiver's statement of facts in as much as he does not have access to the principals or records of MSA. For purpose of the Court's examination of the current motion, Dr. Gerber submits that the relevant facts are as follows:

1.  Merrill Scott and Associates, Inc. ("MSA") offered its clients a variety of estate planning services and products designed to provide asset protection and tax benefits. *See* Affidavit of Janet Ackerson, Exhibit "A" ¶ 5.

3

2. MSA utilized different structures and products to achieve client objectives, including but not limited to, wills, trusts, and family partnerships and the utilization of services and products provided by a number of different MSA entities, such as Gibraltar Permanente Assurance, Ltd. ("GPA"); Phoenix Overseas Advisors, Ltd.; Equity Management Mortgages; Fidelity Funding, Ltd; Legacy Mortgage, Ltd; Legacy Capital, LLC; and Legacy Servicing, LLC. *Id.* ¶ 6.

3. MSA was instrumental in the formation of International Business Companies, Foreign Foundations, Domestic Support Organizations, and Limited Liability Companies (collectively: "client-related entities") that were formed at the clients' request and for the benefit of MSA clients. *Id.* ¶ 7.

4. MSA clients retained a beneficial interest in the client-related entities. *Id.* ¶ 7.

5. As a general rule neither MSA, MSA entities, nor MSA employees had a beneficial ownership interest in the client-related entities or the assets held by the client-related entities. *Id.* ¶ 8.

6. In many instances client-related entities held client investments that had previously been made by the client. *Id.* ¶ 9.

7. Each client plan was individually tailored to meet the unique needs of the client for whom it was designed. Once the plan was structured, the client decided which portions of the plan to use, and the plan was then implemented. *Id.* ¶ 9.

8. MSA plans were individually designed to protect and distribute assets and to defer taxes. Most of the client assets were placed in client-related entities. *Id.* ¶ 9.

4

9.      MSA clients made decisions regarding their individual plan based upon their own specific risk tolerance, financial needs and individual circumstances. Though some plans had common elements, no two client plans were identical. *Id.* ¶ 10.

10.     Client-related entities were never shared between clients. *Id.* ¶ 10.

11.     The choice as to investment risk and which client assets were held in the client-related entities, remained with the client and the risk tolerance of the clients determined what assets they held in their individual structures. *Id.* ¶ 10.

12.     MSA clients, for the most part, did not rely solely on MSA's management efforts for investment returns; rather they managed and directed their own investment affairs through the use of their client-related entities using MSA and its employees like a trustee or fiduciary. *Id.* ¶ 11.

13.     In early 1999 Dr. Gerber contacted MSA for help with estate and tax planning. See, Affidavit of Dr. Richard Gerber, Exhibit "B" ¶ 2.

14.     MSA proposed to Dr. Gerber concepts and options as proposals for his estate and tax plan ("Plan"). The charts attached to the Receiver's Affidavit as exhibits "A" and "B" represent plan drafts only, and do not correctly reflect the actual Plan that was implemented. *Id.* ¶ 3 and Ackerson ¶ 13.

15.     As part of its estate and tax planning service, MSA attorneys helped Dr. Gerber form several business entities for his benefit and use, including, Dark Amethyst LLC, Au Panache, Ltd, and Jewel of the Isles ("Gerber Entities"). Gerber Affidavit ¶ 4 and Ackerson Affidavit ¶ 14.

5

16.    Lawyers at the Estate Planning Institute and employees of MSA ("MSA agents")
managed the Gerber Entities, and Dr. Gerber regarded these persons as his lawyers.
Gerber Affidavit ¶ 4.

17.    Prior to his association with MSA, Dr. Gerber purchased several Limited Partnership
interests that are now part of the Franklin Street Properties investments ("FSP
Investments and DA Assets") held by the Gerber Entities. *Id.* ¶ 5 and Ackerson¶ 16

18.    Dr. Gerber transferred assets to various MSA estate and tax planning programs,
structures and entities that had been created for him to receive those assets. Portions
of these assets were ultimately utilized to purchase additional investments currently
held in the name of Dark Amethyst LLC. Gerber Affidavit ¶ 6 and Ackerson
Affidavit ¶ 17.

19.    As the managers of the Gerber Entities, MSA agents did not have complete
autonomy. All significant actions regarding the Gerber Entities were completed
either at the direction of a Gerber Entity or in some cases upon Dr. Gerber's direct
authorization and direction. Gerber Affidavit ¶ 7 and Ackerson Affidavit ¶ 19.

20.    Neither MSA, its related entities, nor its agents have ever been the beneficial owner
of the assets held by the Gerber Entities. Gerber Affidavit ¶ 8 and Ackerson Affidavit
¶ 18.

21.    In February 2003, Dr. Gerber received a letter from the Receiver, which informed Dr.
Gerber that the Receiver was not maintaining the legal status of the various client-
related entities, including the Gerber entities. The letter states that Dr. Gerber, as a
result, may be running certain tax and legal risks, and advised him to seek

6

independent legal and tax advice. *See*, Receiver Letter February 2003, Exhibit, "C" and Gerber Affidavit ¶ 9.

22. To safeguard the Gerber Entities as well as the integrity of his estate plan, Dr. Gerber contacted John Dyrud, of the firm of Webster Dyrud Mitchell, an attorney in the British West Indies. Mr. Dyrud began the process of transferring the management of the Gerber Entities to the Sanguine Trust for which Junior Seabrookes serves as Trustee. Prior to completing the process the Receiver took action to block the orderly transfer of the management and ownership of the DA Assets. *Id.* ¶ 10.

23. Prior to his filing of the Motion to Consolidate ("Receiver's Motion"), neither the Receiver nor anyone representing the Receiver contacted Dr. Gerber, Mr. Dyrud, the Sanguine Trust or Junior Seabrooks regarding the DA Assets, *Id.* ¶ 11.

24. The Receiver has not taken the deposition of Dr. Gerber, or asked him to explain the components of his estate plan or provide records related to facts asserted in his Memorandum in Support of his Motion, nor the assertions in his Declaration. *Id.* ¶ 11.

25. It is likely during the coming year that the DA Assets will significantly increase in value, as it is anticipated that the FSP Investment will become publicly traded. *Id.* ¶ 12.

26. The Investments pay a quarterly dividend of approximately $27,000.00. *Id.* ¶ 12.

27. The current value of the FSP Investment is approximately $ 1,322,500.00. *Id.* ¶ 12.

28 There is a ten percent penalty fee for early liquidation of the FSP Investment. *Id.* ¶ 12.

29.   If the Receiver is allowed to liquidate the Franklin Street Investments and it is later determined that the asset belonged to Dr. Gerber or one of the Gerber Entities, the asset will lose approximately $132,250.00 of its value in payment of unnecessary fees, lose the future dividend income of $108,000.00 annually, and either Dr. Gerber or the Gerber Entities will be deprived of the anticipated rise in the investment's value as a result of the Investment going public. *Id.* ¶ 13.

30.   The forced liquidation of an asset later determined to belong either to Dr. Gerber or a Gerber Entity will unavoidably create a harmful, unnecessary and irreversible tax event of significant size for Dr. Gerber or the Gerber Entities. *Id.* ¶ 13.

31.   On January 23, 2002, this court issued a Stipulated Order Appointing Receiver ("Stipulated Order"), which imposed an asset freeze over assets "belonging to or in control of Merrill Scott." See, Exhibit "D" Stipulated Order §I (a).

32.   The Stipulated Order invested the Receiver with broad powers "to have control of, and to close, transfer or otherwise take possession of all accounts, securities, funds, or other assets of, or in the name of Merrill Scott at any bank, brokerage firm or financial institution which has possession, custody or control of any assets or funds of Merrill Scott or of any assets deposited by customers or clients with Merrill Scott or into an account in the name of Merrill Scott or held in trust or deposited with Merrill Scott or its agents or trustees. . . ." *Id.* §I (b).

33.   The Stipulated Order also authorizes the Receiver "to liquidate and convert into money all assets held in his possession and control by the means and in the manner most beneficial to the persons or parties entitled to the proceeds. . . ." *Id.* §II (b).

8

## ARGUMENT

### GENERAL STATEMENT

The Receiver's Motion seeks a court order ratifying the Receiver's determination to liquidate the DA Assets. The Receiver does not contest Dr. Gerber's beneficial ownership of the DA Assets, but rather maintains that since MSA "controls" the property, then pursuant to the Stipulated Order, the property becomes part of the receivership estate. He cites no case law or statutory authority in support of this position but rather relies solely on the Stipulated Order. We strongly disagree with the Receiver's apparent position that MSA's management of property transfigures the property into part of the receivership estate. Moreover, consolidation of the DA Assets is premature because there is no plan designed to determine whether the DA Assets are part of the Receivership Estate, and no meaningful opportunity has been afforded Dr. Gerber to present evidence to contest Receiver's position, as he is a non-party to this action.

I.  **THE DARK AMETHYST ASSETS ARE NOT PART OF THE RECEIVERSHIP ESTATE NOR SHOULD THEY BE SUBJECT TO THIS COURT'S ORDER FREEZING ASSETS**

This court issued a Stipulated Order Appointing Receiver under which the Receiver is charged with the ability to take control of MSA assets and also "assets deposited by customers or clients with Merrill Scott, or into an account in the name of Merrill Scott, or held in trust or deposited with Merrill Scott or its agents or trustees." Stipulated Order at 2-3.

Though the Stipulated Order grants these broad powers, they are not unlimited; they are bounded and circumscribed by principles of equity, fairness and due process that are implicit and evident in the case law governing equity receiverships. *See, generally, S.E.C. v Black*, 163 F.3d

9

188, 198 (3rd Cir. 1998) and *S.E.C. v. American Capital Investments, Inc.*, 98 F.3d 1133-1144 (9th Cir. 1996).

The Receiver, on this Motion, asserts that the Stipulated Order empowers him to liquidate the assets of MSA's clients, which assets were *merely managed* by MSA employees or agents, without first making a prior determination of ownership, and determining whether the receivership has any ultimate right to liquidate and distribute these assets.[1]

This cart-before-the-horse approach unavoidably leads to inequitable results, as would be the case here, if the Receiver is allowed the consolidation and liquidation of a client asset to which he claims no ownership and which may well later be determined to fall outside the scope of the receivership estate asset pool.

Citing this Court's order exclusively, the Receiver asserts that because Dr. Gerber established David Ross as manager of Dark Amethyst, LLC, the MSA receivership estate has the right to possess, consolidate and liquidate the DA Assets, and include them in a pool for general distribution. That approach is not only unjustified, it is unsupported by applicable case law governing equitable receiverships. Moreover, such an approach is inequitable and unnecessary in this case.

In order to consolidate and liquidate the DA Assets, the Receiver must either show 1) MSA's outright ownership of the DA Assets, or 2) that they are somehow "tainted" as a result of DA's or Dr. Gerber's participation in the a Ponzi scheme, or that the DA Assets were actually

---

[1] It is clear that the Receiver's ordering of the operation of the receivership is as follows: 1) Asset freeze; 2) obtain asset control; 3) consolidate assets by liquidation and conversion to money; 4) "ultimately" recommend a plan of distribution. See Receiver's Memo. at 3, ¶4; and Broadbent Declaration at 2, ¶5. Nothing in this court's order mandates that order of operation, mandates consolidation and liquidation before prior determination of ownership, a distribution plan and opportunity for determination of client rights to separate assets.

10

part of the alleged Ponzi scheme. *Black, supra,* at 196; *S.E.C. v. Elliott*, 953 F.2d 1560, 1573 (11th Cir. 1992); *S.E.C. v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991). In his Motion the Receiver does not demonstrate ownership of the DA Assets, has made no attempt to tie the DA Assets to the alleged fraudulent conduct and has provided no evidence that would otherwise "taint" the DA Assets as a part of the scheme.

### A.  No evidence of MSA ownership interest

The Receiver's Motion does not contend that either MSA or Ross has an ownership interest in DA or its assets.[2]  MSA is not in possession of the DA Assets, and the only evidence before the Court is that the Gerber Entities own the DA Assets.  Since MSA does not own the DA Assets, then in order for the Receiver to succeed in his Motion, he must demonstrate that the DA Assets were "tainted" by the alleged "Ponzi scheme".     The Receiver has provided no evidence whatsoever of "tainting".

### B.  The DA Assets are not "tainted"

To prove that the DA Assets are "tainted" the Receiver most prove that either Dr. Gerber or DA was part of the alleged fraud or that the DA Assets themselves were tainted. *Black Id.; Elliot Id.*

### i.  Neither Dr. Gerber nor the DA Assets were involved in Ponzi wrongdoing

In *Black*, the court rejected the SEC's theory that all client assets should be consolidated and pooled together. *Black* at 197.  Instead, the court found that the receiver could not freeze assets of investors not involved in the wrongdoing. *Id.*  The court stated "there is no evidence

---

[2] Receiver's facts assert that Ross is a "member" of DA, relying on Ross' signature on the DA Operating Agreement.  However, Ross signed only as "Managing Agent."  See, Broadbent Decl., Exh. D, last page.  The

11

that this [fund commingling and pooling] was done by anyone other than defendants. Transfers or invasion of the pooled account for the benefit of others accomplished by [defendants] do not implicate [the investors] in such a way as to make their assets the proper subject of a freeze based on the defendant's wrongdoing." *Id*.

Likewise in *Elliott* the court stated that a party "must come with clean hands." *Elliott* at 1575. The court reasoned that the receiver should not be allowed to recover a sum based on fraud. *Id*. The court stated that it would not be appropriate "to permit the [R]eceiver affirmatively to obtain money from a third-party when that party's obligation has been obtained and created by fraud." *Id*.

Finally, in *Cherif,* the court, interpreting a federal statute held that nothing in the statute or case law "authorizes a court to freeze the assets of a party, one against whom no wrong-doing is alleged." *Cherif* at 414. Dr. Gerber had no idea that MSA was involved in a fraudulent scheme and was ultimately the victim of fraud. There is no evidence of or even suggestion of Dr. Gerber's participation in the fraud.

### ii. The Receiver has failed to present any evidence demonstrating that the DA Assets played a part in the "Ponzi" scheme

In an equity receivership of this type, courts are careful to limit a Receiver's power of consolidation and liquidation of dissimilar classes of client assets. *See, S.E.C. v. CreditBanCorp*, 290 F.3d 80, 88 (2nd Cir. 2002); and *Elliott, supra* at 1573. In *CreditBanCorp*, the court stated that the receiver has no power to consolidate assets where parties are not similarly situated.

---

affidavits of Dr. Gerber and Janet Ackerson both disprove the assertion or assumption that Ross or MSA and any ownership interest.

12

*CreditBanCorp* at 88.    And in *Elliot*, the court also restricted the receiver's power based on the different circumstances of the investors. *Elliott* at 1573.

Surprisingly, the Receiver cites *Elliott* in support of his assertion that all investors, should be treated equally, *see* Receiver's Memo at 12,    though *Elliot* stood *against* the receiver's consolidation of a defrauded investor's assets.    The court reasoned that it would be difficult "for equity to permit the Receiver to bring money into the receivership from someone who was defrauded by [the defendant].    *In effect, equity would be sanctioning further torment of a defrauded investor."    Id.* at 1574-1575 (emphasis added).

The asset protection and tax structures that MSA assisted their clients to set up, the objectives of each, and the assets that funded and were held in these structures are as diverse as the clients themselves.    At this juncture, there has been no plan presented for disposition of frozen assets; no determination of classification of similarly situated clients; nor a proper showing that any of the frozen assets of one client are related to those of any other client, which assets might have been employed in a Ponzi scheme.    Particularly, there is no showing that the DA Assets were so employed, or that Dr. Gerber is, by himself, a separate client or a member of a class of similarly situated investors.

The facts and result in *Black* are illustrative.    In *Black*, defendant investment advisors managed various client accounts.    Some accounts were pooled; others were separate client accounts held at various financial institutions, having diverse objectives and holding distinct investment products.    The S.E.C. filed an action alleging various securities violations and that defendant in *Black* was operating a "Ponzi scheme."    A receiver was appointed.    The assets of all clients held in defendant-managed accounts were initially frozen.    *Black.* at 192.    The equity

13

receiver later reported back to the court, that there were four categories of client-types: A, B, C, and D. The character of the investment and the means by which the accounts were maintained (separate or pooled) delineated these categories. Only the type C client accounts were maintained in defendant's pooled account that was alleged to have operated as a Ponzi scheme. The receiver then lifted the freeze on the non-pooled client assets. The court held that the receiver's determination to so lift the freeze on categories A, B, and D client assets was correct, despite a finding that there had been some use of category C client funds[3] for the benefit of the other categories. *Id.* at 197. The court determined that the client assets of other types were beyond the reach of the receiver since the defendants did not have sufficient ownership or "control" over the assets, and since the investors were not involved in the fraudulent scheme. *Id.*

In this case Dr. Gerber is not similarly situated to the other clients. In reality, all of the structures created for MSA clients were vastly different in concept and purpose. MSA initially counseled investors as to tax savings, asset protection, and the potential risks and rewards of any structure. But the investors, in conjunction with attorneys and planners, made the decisions regarding how their funds would be invested. See Gerber Affidavit at ¶ 4. Indeed, MSA was by-and-large out of the picture once the investor was counseled regarding his options. Dr. Gerber chose to set up his structure to maximize his income potential, minimize tax obligations, and protect his assets, unlike the cases Receiver relies on, he did not hand over his assets to MSA in exchange for a promised return.

---

[3]The receiver and the *Black* court referred to these transactions as "cash taints." *Id* at 192.

14

Finally, while an investor's ability to trace his assets may not be entirely determinative, it is an important factor for courts in determining the relative positions of investors. *See Carrozzella* 237 B.R. at 550 (D.C. Conn. 1999) Dr. Gerber can trace his assets since DA was formed to hold the assets and since his entities maintained control over his assets. *See* Gerber Affidavit at ¶ 4-7.

As previously mentioned, MSA did not own, possess, or control the DA Assets some of which Dr. Gerber owned prior to his contact with MSA. DA was created to protect assets and for tax purposes. DA was not aware of or involved in the fraud perpetrated by MSA. The Receiver has not produced any evidence indicating otherwise. In other words, DA is a non-party to MSA's indiscretions. Like the investors in *Black* and *Elliott*, Dr. Gerber was a non-party, innocent of the fraud, and a victim of the fraud, and allowing the Receiver to access his assets would perpetuate the fraud. Under the circumstances, the Court should interpret and modify the Stipulated Order to restrict the reach of the Receiver. The DA Assets, and other non-party assets like it, should not be included among the assets of MSA.

## II. THE RECEIVER'S INTERPRETATION OF THE ORDER IS TOO BROAD – THE RECEIVER HAS FAILED TO PROVE THAT THE DA ASSETS SHOULD FALL WITHIN THE RECEIVERSHIP ESTATE

The Receiver's Motion relies entirely upon the language of the Receivership Order: "in control of Merrill Scott. . . ." The Receiver argues that "control" by MSA over a client asset is determinative of his power to liquidate the asset. Dr. Gerber disputes that point, but more importantly, asserts that MSA never "controlled" the DA Assets.

The Receiver's evidence of MSA "control" over DA and its assets is limited to facts showing that Ross was manager of DA, and that DA's mail is sent Ross' address etc. *See* Receiver's Memo. at 8. Mere indicia of administrative tasks incident to management function is certainly not "control" sufficient to justify consolidation and liquidation of the DA Assets. The Receiver's apparent approach to "marshaling" the assets by first liquidating, *then* forming a plan, is troubling. It is axiomatic that the Court's order was not intended to nor did it grant the Receiver power to liquidate and distribute property that was not either an asset of MSA, or property that was part of the alleged "Ponzi" scheme. Merely because Dr. Gerber was an MSA client does not grant the Receiver authority over property that he owns or has a beneficial ownership interest in, no matter who he chooses to install as a manager.

The issue is not simply an issue of "control," but necessarily must involve an analysis of the relationship between the parties, the ownership of the asset, and the degree to which, if any, the asset was involved in the alleged scheme.

MSA agents functioned as managers of client assets. It is a well-settled legal principle that management control does not equate to ownership. *See, S.E.C. v. Comcoa Ltd.*, 887 F. Supp. 1521, 1524 (S.D. Fla. 1995); and *Carrozzella & Richardson v. Radulesco*, 247 B.R. 595, 600 (2nd Cir. 2000). In *Carrozzella*, a client deposited money into her attorney's trust account. The attorney utilized her funds and the pooled funds of other clients to perpetrate a Ponzi scheme. The court held that despite the fiduciary relationship, the client still controlled the funds. In addition, the court held that the attorney "did not own an equitable interest in property he holds in trust for another." *Id*.

16

In this case, MSA never owned an interest in the funds of DA. Similar to the facts of *Carrozzella*, David Ross had a fiduciary obligation to Dr. Gerber with respect to the management of DA, which does not transmogrify into ownership, merely because the attorney engages in wrongdoing with respect to other client's funds.

The ultimate control of the DA Assets rested with the Gerber Entities acting at his direction or Dr. Gerber. *See* Gerber Affidavit at ¶ 6; Affidavit of Ackerson at ¶ 19. In *Black*, the court ultimately held that the assets not controlled by the schemers were out of the reach of the receiver. *Black, Supra* at 196. The *Black* court reasoned that the fact that the defendants managed the assets did not necessarily mean they maintained the requisite control. *Id.*

In this case, as in *Black*, DA's assets are not assets of MSA or subject to liquidation merely because an employee or agent exercises some modicum of management. The Receiver makes no supported assertion that DA's assets were involved in the Defendant's theft and embezzlement scheme to deprive other clients of their assets. DA was created for asset protection and tax purposes. Even if, assuming, *arguendo*, the Receiver could demonstrate MSA somehow maintained a measure of control over DA's assets, mere management of an asset, as *Black* demonstrates, is not enough. Under the holding of *Black*, the Receiver must demonstrate that MSA had an ownership interest or that the assets of DA were somehow "tainted." Absent such a showing, not only should the assets not be liquidated, but the freeze on these assets should be lifted.

17

## III.    THE RECEIVER'S ACTIONS ARE PREMATURE

This action began on January 15, 2002 with a complaint filed by the S.E.C. A Stipulated Order appointing the Receiver that was entered on January 23, 2002 followed the Complaint. Understandably, the Order was broad in its scope and power. Prudence would dictate that at the beginning of a receivership a receiver have all requisite power and authority to "marshal the assets" of the receivership estate and prevent their disappearance or dissipation. Certainly a broad order freezing the "asset" of the receivership estate is an important tool for the receiver to accomplish his task.

However, the receivership and asset freeze has now been in place for over twenty one (21) months. The Receiver has filed ten receivership reports, recovered $8.6 million in assets that he maintains belong to the receivership estate and billed the estate $1.8 million. *See* selections from Receivership Reports attached hereto as Exhibit "E". We do not quarrel with the Receiver' intentions, motives or integrity but take issue with the continued liquidation of "assets" without there first being a court-sanctioned determination of what is legitimately part of the receivership estate.

A review of similar cases suggests that an orderly management of the receivership estate proceeds in the following procedural pattern; 1) Complaint filed and Receiver Appointed; 2)Assets frozen; 3) Marshaling of assets and evaluation of what comprises receivership estate; 4) Approval of a Plan of Distribution that establishes ownership rights and privileges; 5) Liquidation (if needed); and 6) Distribution. *See generally, S.E.C. v. Elliott*, 953 F.2d 1560 (11th Cir. 1992) and *S.E.C. v. Black*, 163 F.3d 188 (3rd Cir. 1998).

18

In the MSA receivership there has yet to be a proposed Plan of Distribution, yet the Receiver is moving forward with the confiscation and liquidation of "assets" which he alone deems are part of the receivership estate. Each of the last six receivership reports beginning with the October 18, 2002 report and ending with the tenth report filed on August 8, 2003, has included under the heading of "Plan of Distribution" an explanation that the Receiver is "also assisting the Securities and Exchange Commission in its development of a proposed plan of distribution," yet no plan has been filed.

By liquidating assets without first determining if they are part of the receivership estate the Receiver is fixing the rights and remedies of non-parties without giving them an opportunity to be heard, creating not only financial hardship but in the process a potential due process violation. As argued herein, in order to consolidate and liquidate the DA Assets the Receiver must either show outright ownership of the DA Assets or that they are somehow "tainted" as a result of DA's or Dr. Gerber's participation in the scheme, or that the DA Assets were part of the Ponzi scheme. *Black* at 196; *Elliott* at 1573; and *Cherif* at 414. The Receiver has failed to demonstrate ownership or taint of DA's assets, and there is no showing that he will be able to do so in the future.

Lumping all liquidated MSA client assets into one collective pool group without advance determination of 1) the relative culpability of individual investors, 2) the taint that may color their assets, and 3) the nuances of personalized structures, will lead to harsh and inequitable results for many MSA clients, most notably in the instant case, Dr. Gerber, who stands to suffer monetary losses to the value of these assets and who will be forced to account for an involuntary tax event accounting for the sale. "The cases of each creditor must be examined individually to

19

determine the rights of that individual. The Receiver cannot, for the sake of expediency, group together claimants with different claims." *Elliott* at 1573. *Black* and *Elliott* demonstrate the equity and wisdom in differentiating between investors based on the totality of the circumstances.    As the court in *Elliott* stated, "[T]o argue that all claimants should be treated similarly, without presenting the facts, is an empty argument." *Id.* (emphasis added).

## IV.    THE GRANTING OF RECEIVER'S REQUEST VIOLATES DUE PROCESS

If the Court grants the Receiver's Motion and allows the Receiver to liquidate the DA Assets without first determining that they are rightful part of the receivership estate, such action is tantamount to a taking of property without due process of law. Due process requires notice and an opportunity to be heard. *S.E.C. v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992) (citing *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 542 (1985). Due process essentially requires that the procedures be fair. *Id.* (citing *In re Murchison*, 349 U.S. 133, 136 (1955). The process that is due varies according to the nature of the right and the type of proceedings. *Id.* (citing *Mathews v. Eldredge*, 424 U.S. 319, 334 (1976). Generally, if government action will deprive an individual of a significant property interest, and there is a factual dispute, due process dictates that the individual is entitled to an opportunity to be heard. *Id.*    While we acknowledge that this is a summary proceeding, summary proceedings must not deny a party a "full and fair opportunity to present claims and defenses." *Id.* at 1567.

In *Elliott*, the court stated that "a district court does not generally abuse its discretion if its summary procedures permit parties to present evidence when the facts are in dispute and to make arguments regarding those facts." *Id.* The court states that in a summary proceeding, the parties should have the same relative rights to perform discovery and examine witnesses as they

20

would in a plenary proceeding. *Id*. In this case, before the Receiver's Motion is granted, a determination must be made that the DA Assets should be a part of the receivership estate.

Any ruling on the Receiver's Motion that deprives a third-party of property rights prior to an opportunity for all effected parties to present evidence would be premature and grossly unfair. There has been no opportunity for non-parties to conduct discovery or present discovered evidence.

The remedy for the problem presented by Receiver's Motion, is for the Receiver or the SEC to present a Plan of Distribution before moving any further with consolidation and liquidation. Such a plan should include a determination of what assets are to be part of the receivership estate, including separation of frozen client assets into different categories, the release of the freeze on assets which are not part of the receivership estate, and determination of the rights and privileges of all of MSA clients before moving forward. Once a plan is proposed, then effected non-parties should be given opportunity to be heard on the plan components. Anything less would be premature, a violation of due process and inequitable.

## V. EQUITY DICTATES THAT THE DA ASSETS SHOULD BE LEFT OUT OF THE CONSOLIDATION.

The Receiver maintains that equity demands that the DA Assets be liquidated. The Receiver relies primarily on three cases to support his position. *S.E.C. v.CreditBanCorp Ltd.*, 168 F. Supp. 2d 122 (S.D.N.Y. 2001); *S.E.C. v. CreditBanCorp Ltd.*, WL 1752979 (2000 S.D.N.Y); and *S.E.C. v. Credit BanCorp Ltd.*, 194 F.R.D. 457 (S.D.N.Y. 2000) (the "Receiver's Cases"). The first and most notable problem with the Receiver's legal position and reliance on the cited case law is that it presupposes facts which have not been presented to the Court such as:

21

1) that the MSA structure is a typical "Ponzi" scheme, 2) that MSA owned the DA Assets, 3) that the DA Assets were part of the commingling of funds which occurred as part of a "Ponzi" scheme and 4) that all of the MSA victims were similarly situated. None of the foregoing statements is supported by the Receiver's Memorandum or Declaration. Indeed, as applied to the DA Assets these simply are not the facts.

Furthermore, this case differs from *Credit Bancorp* in that the MSA client plans are particularized. More to the point: the DA Assets were not investments in MSA or any of its affiliates. Dr. Gerber was not given representations of the amount of income he would receive by investing with or in MSA but rather was counseled as to the tax savings, asset protection features, and income potential of the structures that the he himself chose to utilize.

In *Credit Bancorp* the client assets were transferred to Credit Bancorp as an investment. The client had an expectation of a guaranteed investment return based on *income earned by Credit Bancorp*. In contrast, when Dr. Gerber implemented his plan with MSA, the return was based upon his individual investment decisions. There was no guarantee of a return and no relinquishment of the ultimate investment decision. Dr. Gerber or the Gerber Entities decided how funds were invested and the return was a function of the Dr. Gerber's choices and not the management of the funds by MSA, MSA entities, or its attorney-managers. In *Credit Bancorp* funds and securities were shifted regularly among brokerage accounts. This was not the case with MSA and the DA Assets. Funds were invested according to Dr. Gerber or a Gerber Entities' request and the investment was not changed unless requested.

This case is far more like *Black*, *Elliott* and *Cherif* than *Credit Bancorp*. And the equity principles are more similar to those found in *Carrozzella*. In *Carrozzella* funds were entrusted

22

by a client to the fiduciary care of her attorney. *Carrozzella*, 237 B.R. 554 at 550 (D.C. Conn 1999). The funds were held outside the reach of the bankruptcy trustee since the client maintained a beneficial interest to and control over the funds. *Id.* The court stated that the equity principle of equality amongst investors is not properly invoked "when individuals are paid funds in which they already hold a beneficial interest." *Id.* That is precisely the circumstance in this case. Dr. Gerber maintained a beneficial interest to and control over his assets. MSA served only as an administrative conduit, and any and all of Dr. Gerber's assets were transferred to DA. MSA has no right to DA's assets and as a result, neither does the Receiver.

MSA has no possession, ownership, or control of DA, DA is not similarly situated to the other investors, and DA was not involved in the wrongdoing. Indeed, if the Receiver were allowed to reach DA's assets "equity would be sanctioning further torment of a defrauded investor." *Elliot, supra*, at 1574-1575.

Without citing to supporting facts or applicable case law, Receiver asserts that Dr. Gerber has failed to cooperate with the Receiver in his attempts to demand payments and secure unrelated assets to which Dr. Gerber feels the Receivership estate is not entitled. It is wholly inappropriate to raise this issue in the context of the issues before the court. It appears to be a thinly veiled attempt to disparage Dr. Gerber with extraneous, unsupported material, and for that reason, Dr. Gerber declines to answer the allegation.[4]

---

[4] It is particularly difficult to believe that the Receiver apparently feels that all obligations of cooperation run *to him* from MSA clients, while failing to recognize that this action has frozen client assets indefinitely—with no apparent no plan categorizing clients or assets, or ultimately, distributing assets to which the Receivership estate *may be entitled*. Meanwhile, already exhausted is approximately $1.8 million in costs and fees, which Dr. Gerber has a reason to suspect have come directly from the consolidated and liquidated of *client assets* for which there has been no due process afforded to the effected clients. Contrary to the Receiver's view, Dr. Gerber has the right to try to protect his assets from what appears to be a Receivership running on without a plan or end in sight.

23

## CONCLUSION

Wherefore, for the above-stated reasons, Dr. Gerber respectfully requests that the

Court deny Receiver's Motion, and in addition, requests oral argument on the Motion.

DATED this **20**ᵗʰ day of October, 2003.

WOODBURY & KESLER, PC

Mark J. Griffin
Attorneys for Dr. Gerber

## CERTIFICATE OF SERVICE

I do hereby certify that on the 20ᵗʰ day of October, 2003, I sent via facsimile and first
class U.S. Mail, postage prepaid, a true and correct copy of the foregoing MEMORANDUM IN
OPPOSITION TO RECEIVER'S MOTION FOR CONSOLIDATION OF FROZEN ASSETS to
the following:

Thomas M. Melton
William B. McLean
Securities & Exchange Commission
Salt Lake District Office
50 South Main Street, Suite 500
Salt Lake City, Utah 84144

Reha Deal
Gavin M. Reese
HOLLAND & HART
60 East South Temple, Suite 2000
Salt Lake City, Utah 84111

24

Exhibits/
Attachments
to this document
have **not** been
scanned.


Please see the
case file.



RECEIVED CLERK
FILED
· 2004 DEC -8 P 5: 47

U.S. DISTRICT COURT
DISTRICT OF UTAH

Mark J. Griffin #4329
Nicholas E. Hales #4045
P. Corper James #8960
WOODBURY & KESLER, P.C.
265 East 100 South, Suite 300
P. O. Box 3358
Salt Lake City, Utah 84110-3358
Telephone: (801) 364-1100

Attorneys for Property Owners

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | **OBJECTION TO PROTECTIVE ORDER** |
| Plaintiff, | |
| v. | |
| MERRILL SCOTT & ASSOCIATES, LTD; MERRILL SCOTT & ASSOCIATES, INC.; PHOENIX OVERSEARS ADVISORS, LTD; PATRICK M. BRODY; DAVID E. ROSS II; and MICHAEL G. LICOPANTIS, | Civil No. 2:02 CV-0039C Judge Tina Campbell Magistrate Judge David Nuffer |
| Defendants. | |

Duane Asp, Ralf Leszinski, Alan Cohoon, Douglas MacKinnon, Larry Cotten, Larry

Mahisekar, Douglas Drexler, Richard Gerber, Christopher Harrison, Robert Herbolich, Eric

Kooba, Hector LeMarque, Stephen Serlin, Jay Sharp Sr., Lou White, and Michael Williams

(collectively the "Property Owners") by and through their attorneys, hereby object to the

protective order as signed by the court December 8, 2004 for the following reasons:



EXHIBIT
2



1.      November 1, 2004, the Court heard the parties on the Property Owners Motion to Intervene and Temporarily Extend Claims Bar Date, and ruled, among other things, that the claims forms would be subject to a Protective Order of this court, barring disclosure of the contents of the claims forms and pertinent documents to third parties, with the single exception of disclosure to the U. S. Justice Department, for the reason that the Securities and Exchange Commission was under statutory obligation to do so.

2.      The court directed the parties to settle on mutually satisfactory language for a Protective Order draft to be submitted to the court.

3.      November 23, 2004, counsel for the Receiver forwarded language of a draft order that was unacceptable to Property Owners for the reason that it did not reflect the court's ruling on the limited disclosure to the U.S. Justice Department.

4.      The forwarded draft allowed the sharing of Confidential Information on the forms with a host of persons other than the U.S. Justice Department (See ¶ 6 and 7 of Protective Order).

5.      Counsel for the Property Owners notified Receiver's counsel that the draft language did not reflect the ruling of the court and twice suggested conforming changes.

6.      December 4, 2004, counsel for the receiver contacted Property Owners' counsel by telephone and stated that 1) SEC would not agree to Property Owner's conforming changes, 2) would not further attempt to resolve the disagreement by conference or discussion and 3) the

2

Receiver and the SEC were submitting the draft to the Court to which Property Owners could object.

7.    December 7, 2004, with only the SEC and the Receiver signing "Approved as to form," the Receiver submitted the Protective Order. The Court signed the Order on December 8th. The submission of the proposed Protective Order with the signatures of only the non-objecting parties "Approving as to form" may have given the mistaken impression that there were no objections.

8.    Under the circumstances of service by mail, DUCivR 54-1 allows 8 days for objections to Proposed Orders.

## CONCLUSION

The signed order clearly is contrary to the court's ruling on the disclosure of this confidential information. The court's order, if allowed to stand would have the effect of allowing the Receiver and the SEC to share confidential information contrary to the court's narrow ruling.

Given the necessity of preventing this disclosure, Property Owners respectfully request that the December 8th Protective Order be immediately set aside and that the court issue the attached Protective Order as it is more in conformity with the court's ruling, and take such additional steps as are necessary to preserve its ruling and the confidentiality of the Property Owner's information.

A draft Order Setting Aside Protective Order is attached for the Court's convenience.

3

DATED this 6ᵗʰ day of December, 2004.

WOODBURY & KESLER, PC

Mark J. Griffin
Nicholas E. Hales
P. Corper James
Attorneys for the Property Owners

4

## CERTIFICATE OF SERVICE

I do hereby certify that on the 9th day of December, 2004, I sent via first class U.S. Mail, postage prepaid, a true and correct copy of the foregoing **OBJECTION TO PROTECTIVE ORDER** to the following:

Thomas M. Melton
William B. McLean
Securities & Exchange Commission
Salt Lake District Office
50 South Main Street, Suite 500
Salt Lake City, Utah 84144
 *Attorneys for the Securities &*
*Exchange Commission*

Max D. Wheeler, Esq.
Robert J. Shelby, Esq.
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
P.O. Box 45000
Salt Lake City, UT 84145-5000
 *Attorneys for David E. Ross, II*

Richard Clayton
Reha Deal
Brent E. Johnson
Holland & Hart
60 East South Temple, Suite 2000
Salt Lake City, UT 84111
 *Attorney for David K. Broadbent, as*
*Receiver for Merrill Scott & Associates*

Randy Parr, Esq.
Dickstein Shapiro Morin & Oshinsky
1177 Avenue of the Americas
New York, NY 10036-2714

Rodney G. Snow, Esq.
CLYDE SNOW SESSIONS & SWENSON
201 South Main, Suite 1300
Salt Lake City, UT 84111
 *Attorneys for Michael G. Licopantis*

Randall Mackey, Esq.
Gifford W. Price, Esq.
Russell C. Skousen, Esq.
Mackey Price & Thompson
350 American Plaza II
57 West 200 South
Salt Lake City, UT 84101
 *Attorneys for Patrick M. Brody*

Steven A. Siskin, Esq.
SISKIN & BARRETTO, P.L.L.C.
105 West Woodlawn Avenue
San Antonio, TX 78212-3457
 *Attorneys for James P. Landis*

Kristopher A. Kuehn, Esq
Warden Triplett Grier
9401 Indian Creek Parkway, Suite 1100
Overland Park, Kansas 66210
 *Attorneys for Defendant Certain*
*Underwriters at Lloyds, London*

5

Peter W. Billings, Jr., Esq.
Joan M. Andrews, Esq.
FABIAN & CLENDENIN
P.O. Box 510210
Salt Lake City, UT 84151
  *Attorneys for Defendant Certain*
   *Underwriters at Lloyds, London*

Mary C. Gordon, Esq.
MANNING CURTIS BRADSHAW & BEDNAR
Third Floor Newhouse Building
10 Exchange Place
Salt Lake City, UT 84111

6

FILED
CLERK, U.S. DISTRICT COURT

2004 DEC 21  P 3: 05

DISTRICT OF UTAH
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| vs. | ORDER |
| MERRILL SCOTT & ASSOCIATES, LTD; et al., | |
| Defendants. | No. 2:02CV0039TC |
| DAVID K. BROADBENT, ESQ., AS RECEIVER FOR MERRILL SCOTT & ASSOCIATES, LTD.; et al., | Judge Tena Campbell Magistrate Judge David Nuffer |
| Plaintiff, | |
| vs. | |
| LIFETIME PRODUCTS, INC, a Utah corporation, | |
| Defendant. | |

This case is before the court on objections by the Property Owners (Duane Asp, Ralf

Leszinski, Alan Cohoon, Douglas Mackinnon, Larry Cotten, Larry Mahisekar, Douglas Drexler,

Richard Gerber, Christopher Harrison, Robert Herbolich, Eric Kooba, Hector LeMarque, Stephen

Serlin, Jay Sharp Jr., Lou White, and Michael Williams) to the court's December 8, 2004

Protective Order. The Property Owners contend that the Protective Order does not adequately

reflect the court's November 1, 2004 ruling.

EXHIBIT
3
PENGAD 800-631-6989

After thoroughly reviewing the Property Owners' objections, the court orders that

paragraph six section (f) of the December 8, 2004 Protective Order shall state: "(f) The United

States Attorney's Office for the District of Utah." The court finds that removing the reference to

"any other department or agency of the federal government" accurately reflects the court's

November 1, 2004 order. The court declines to adopt all other changes to the Protective Order

sought by the Property Owners' objections. Accordingly, the court GRANTS IN PART and

DENIES IN PART the Property Owners' objections.

SO ORDERED.

DATED this **21** day of December, 2004.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Court

2

United States District Court
**for the**
District of Utah
December 22, 2004


* * CERTIFICATE OF SERVICE OF CLERK * *


Re:  2:02-cv-00039


True and correct copies of the attached were either mailed, faxed or e-mailed
by the clerk to the following:

    James P. Landis
    105 W WOODLAWN
    SAN ANTONIO, TX  78212

    Mr. Peter W. Billings Jr, Esq.
    FABIAN & CLENDENIN
    215 S STATE STE 1200
    PO BOX 510210
    SALT LAKE CITY, UT  84151
    EMAIL

    Kristopher A. Kuehn, Esq.
    WARDEN TRIPLETT GRIER
    9401 INDIAN CREEK PKWY STE 1100
    OVERLAND PARK, KS  66210
    EMAIL

    Mr. Richard D Burbidge, Esq.
    BURBIDGE & MITCHELL
    215 S ST ST STE 920
    SALT LAKE CITY, UT  84111
    EMAIL

    Mark A. Solomon, Esq.
    LIONEL SAWYER & COLLINS
    300 S FOURTH STE 1700
    LAS VEGAS, NV  89101

    Brent E. Johnson, Esq.
    HOLLAND & HART
    60 E SOUTH TEMPLE STE 2000
    SALT LAKE CITY, UT  84111-1031
    EMAIL

    Randy Paar, Esq.
    DICKSTEIN SHAPIRO MORIN & OSHINSKY
    1177 AVENUE OF THE AMERICAS
    NEW YORK, NY  10036-2714

    Mr. Max D Wheeler, Esq.

SNOW CHRISTENSEN & MARTINEAU
10 EXCHANGE PLACE
PO BOX 45000
SALT LAKE CITY, UT  84145-5000
EMAIL

Mr. Randall A Mackey, Esq.
MACKEY PRICE THOMPSON & OSTLER
57 W 200 S STE 350
SALT LAKE CITY, UT  84101-1655
EMAIL

Mr. Thomas M Melton, Esq.
SECURITIES AND EXCHANGE COMMISSION
15 W SOUTH TEMPLE STE 1800
SALT LAKE CITY, UT  84101
EMAIL

Mark J. Griffin, Esq.
WOODBURY & KESLER
265 E 100 S STE 300
SALT LAKE CITY, UT  84111
EMAIL

Richard G. Cook, Esq.
COOK & CO PLLC
2425 CATALINA DR
SALT LAKE CITY, UT  84121
EMAIL

Mary C. Gordon, Esq.
MANNING CURTIS BRADSHAW & BEDNAR LLC
THIRD FLOOR NEWHOUSE BLDG
10 EXCHANGE PL
SALT LAKE CITY, UT  84111
EMAIL