# EXHIBIT A



**U.S. Securities and Exchange Commission**

Thomas M. Melton (4999)
William B. McKean (4883)
Attorneys for Plaintiff
Securities & Exchange Commission
50 South Main Street, Suite 500
Salt Lake City, Utah 84144-0402
801-524-5796

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION
UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MERRILL SCOTT & ASSOCIATES, LTD.<br>MERRILL SCOTT & ASSOCIATES, INC.<br>PHOENIX OVERSEAS ADVISERS, LTD.<br>GIBRALTAR PERMANENTE ASSURANCE, LTD.<br>PATRICK M. BRODY<br>DAVID E. ROSS II, and<br>MICHAEL G. LICOPANTIS<br><br>Defendants, | Civil No. 2:02CV 0039C<br><br>COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIONS AND LEGAL AND OTHER EQUITABLE RELIEF |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendants Merrill Scott & Associates, Ltd. ("MSA"), Merrill Scott & Associates, Inc. ("MSAI"), Phoenix Overseas Advisors, Ltd. ("Phoenix"), Gibraltar Permanente Assurance, Ltd. ("Gibraltar"), Patrick M. Brody ("Brody"), David E. Ross II ("Ross") (collectively these defendants will be referred to as "Merrill Scott") and Michael Licopantis ("Licopantis") alleges as follows:

1. Merrill Scott is engaged in an ongoing scheme in which it has obtained investments of an unknown amount, but which exceeds $25 million, from clients to whom it provides offshore tax planning and asset protection advice and services. Merrill Scott provides its services in the form of a "Master Financial Plan" it sells to clients and implements on their behalf. The implementation of the plan involves the establishment of offshore entities and the execution of transactions through which its clients invest funds, securities and other assets. Merrill Scott promises its clients that, through the implementation of the Master Financial Plan, the clients will reduce their taxes by significant percentages, have their investments grow offshore in a tax free environment, and will be able to protect their assets from unwanted liabilities and encumbrances. Merrill Scott sells securities to its clients as part of its Master Financial Plan.

2. In fact, since in or about 1998, Merrill Scott has misappropriated investor funds and securities for uses contrary to representations made to investors. Investor funds have been used to pay for Brody's personal expenses and extravagant lifestyle. Investor funds have been used for the obligations and expenses of Merrill Scott and to invest in start-up companies unaffiliated with Merrill Scott. This misappropriation of investor funds is ongoing. Recently, new funds coming to Merrill Scott from new clients and from the sale of securities have been used to pay Merrill Scott's obligations to old clients and for obligations of other clients' plans, rather than in accordance with the plans of the clients who invested the funds. In other words, Merrill Scott is currently operating a Ponzi scheme. In addition, Brody intends to misappropriate approximately $1.4 million of client money deposited in accounts controlled by Merrill Scott to purchase the stock of a start-up company unrelated to Merrill Scott or the plans of the clients.

3. The defendants, directly or indirectly, singly or in concert, have engaged, are continuing to engage, and are about to engage in, transactions, acts, practices, and courses of business that constitute, and would constitute, violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78o(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-6 (1) and (2), and they are likely to repeat such violations in the future unless the Court enjoins them from doing so. Accordingly, the Commission seeks relief in the form of a temporary restraining order, injunctions, disgorgement, civil penalties and other appropriate remedies.

## JURISDICTION AND VENUE

4. The Commission brings this action pursuant to the authority conferred upon it by Section 22(a) of the Securities Act, 15 U.S.C. § 77u(a), Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), and Sections 209(d) and (e) of the Advisers Act, 15 U.S.C. §§ 80b-9(d) and (e), to restrain and enjoin, temporarily, preliminarily and permanently, MSA, MSAI, Phoenix, Gibraltar, Brody, Ross and Licopantis from future violations of the federal securities laws. The Commission also seeks disgorgement by MSA, MSAI, Phoenix, Gibraltar and Brody of their ill-gotten gains plus prejudgment interest, and such other equitable relief as may be deemed appropriate. In addition, the Commission seeks civil penalties from each of the Defendants pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section

21(d) of the Exchange Act, 15 U.S.C. § 78u(d), and Section 209 (e) of the Advisers Act, 15 U.S.C. §80b-9(e). The Commission also seeks specific ancillary relief as detailed in its Prayer for Relief.

5. This Court has jurisdiction over this action, and venue is proper, pursuant to Section 22(a), 15 U.S.C. § 77u(a), of the Securities Act and Sections 21(d) and 27 of the Exchange Act, [15 U.S.C. §§ 78u(d) and 78aa, and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14.

6. The Commission, pursuant to authority conferred upon it by Sections 10(b) and 23(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), and 78w(a), has promulgated Rule 10b-5, 17 C.F.R. § 240.10b-5. Rule 10b-5 was in effect at the time of the transactions and events alleged in this Complaint and remains in effect.

7. The Defendants, directly or indirectly, singly or in concert, made use of the means or instruments of transportation and communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices and courses of business alleged herein. Certain of the transactions, acts, practices and courses of business alleged herein took place in the District of Utah, including, the offer, purchase and sale of securities, and acts and transactions involved in the misappropriation of investor funds and securities. Therefore, venue properly lies in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a); Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14.

## DEFENDANTS

8. **Merrill Scott & Associates, Ltd.** is a Bahamian company. It used to maintain an office in Nassau, Bahamas, but it is has allegedly established an office in Hong Kong. Merrill Scott claims to be a leading firm in the business of providing tax reduction and asset protection through the establishment of offshore entities and accounts.

9. **Merrill Scott & Associates, Inc.**, is a Utah corporation, incorporated in 1993. MSAI's function is to provide the office space and the staff who provide services to Merrill Scott's organization and its investors, and serves as the office through which investors are solicited. MSAI and MSA also regularly induce clients to purchase securities, including those issued by Gibraltar and Phoenix. MSAI is located in Salt Lake City, Utah.

10. **Phoenix Overseas Advisors, Ltd.**, is a Bahamian entity that acts as an investment adviser and a "mutual fund company" for Merrill Scott investors. Phoenix manages "mutual funds" that have been sold to Merrill Scott investors. It also maintains accounts with brokerage firms into which investor securities are placed.

11. **Gibraltar Permanente Assurance, Ltd.**, is an entity organized under the laws of Dominca, a Caribbean island. Gibraltar ostensibly acts as an issuer of many of the investment products sold to Merrill Scott investors. Gibraltar also controls the funds of Merrill Scott investors that are to be repatriated to those individuals from accounts located in the Bahamas.

12. **Patrick M. Brody**, age 37, is founder and control person of Merrill Scott. He is the sole signatory on all the accounts maintained by clients of Merrill Scott and its affiliated entities, including Phoenix and Gibraltar. Brody purportedly has exclusive control of Merrill Scott and its affiliated entities. Brody uses a Bahamian entity, Alex Jones & Associates, Ltd. and Alex Jones & Associates, Inc. as an alter ego.

13. **David E. Ross II**, has been associated with Merrill Scott since approximately 1998. Ross is an attorney licensed to practice in Utah, Kansas and Illinois, with experience in tax and insurance matters. Ross has functioned as General Counsel of MSA, and has been the Managing Director of Estate Planning Institute, a Bahamian law firm, and Gibraltar.

14. **Michael Licopantis** was associated with Merrill Scott functioning as the General Manager of Phoenix and Gibraltar from in or about 1998 until approximately June 2001. Licopantis had authority over the assets maintained or managed by Phoenix and Gibraltar. Licopantis purportedly has extensive experience managing investments for firms in the U.S.

## FACTS

### BACKGROUND

15. Merrill Scott claims to have been in the business of advising and servicing clients in tax reduction and asset protection through offshore planning since at least 1993. The Merrill Scott organization offers services to clients in the United States that are designed to reduce taxes and protect assets through the creation and use of "offshore" legal entities.

16. In a brochure Merrill Scott provides to potential clients, MSA describes itself and the organization:

> Headquartered in the Bahamas, Merrill Scott & Associates is organized as a parent company, charged with coordinating the actions of its subsidiaries, as well as our affiliated law firm. Merrill Scott & Associates consists of a mergers and acquisitions company, a domestic insurance agency, an offshore insurance carrier, an accounting firm, a mutual fund company, a mortgage company and a headquarters services company.

17. Wealthy individuals solicited by Merrill Scott are told that they can utilize loopholes in the Internal Revenue Code and other laws and regulations to minimize tax obligations and protect assets against litigation or other unwanted encumbrances. Merrill Scott offers a product known as a "Master Financial Plan" ("MFP"). One of the functions of the MFP is to provide a means by which the investor can invest cash and securities offshore, usually in the Bahamas or another Caribbean nation, and receive tax-free gains from the investment activity.

18. Merrill Scott also provides investors a means to repatriate assets through transactions that hide the actual ownership of the assets, thereby enabling the investors to utilize the untaxed funds without paying tax obligations. In its sales manual, MSA states:

Case 1:06-mc-00032-RMU    Document 12-4    Filed 07/31/2007    Page 6 of 17

Complaint: SEC v. Merrill Scott & Associates, Ltd., et al.                        Page 5 of 16

> Once money is invested offshore, there are several ways to repatriate part or all of it. These include such non-taxable methods as with secured credit cards, personal or corporate loans, mortgages, personal withdrawals or through insurance policies. Capital can also be repatriated through taxable means such as through salaries or annuities.

19. Merrill Scott advertises its services in publications such as *The Robb Report, Celebrity Living, Tycoon, Departures, Boatshowing* and *The Wall Street Journal*. Merrill Scott also retains financial advisers who solicit investors either through personal contacts or by referral from Merrill Scott and are there to sell the MFP. Merrill Scott solicits investors through its publications and through a website it maintains on the Internet. Most of Merrill Scott's investors appear to have invested since 1998.

20. MSAI advertises the Merrill Scott organization's services and employs the staff who solicit clients and design the investment plans. Merrill Scott's other affiliated entities, including Phoenix and Gibraltar, are involved in structuring the individual details of a investor's plan, issuing and selling the products recommended in the plan, and management of the investor's assets offshore.

21. Merrill Scott retains professionals to provide "expert" advice on the clients' financial plans. Those professionals include attorneys, accountants, financial planners, asset managers and persons with banking expertise.

22. The MFP essentially establishes the framework through which the Merrill Scott investor invests and protects cash and assets, avoids payment of taxes and repatriates his or her funds. The basic structure of the plan involves the transfer of an investor's income and/or assets into offshore entities established on behalf of the investor. These funds and assets are then used to purchase investment and other products offered by MSA and its affiliates.

23. The primary source of revenue to Merrill Scott are the fees associated with the initial development of the MFP and the sale of various investment products, fees for the creation of offshore entities, and transactional and maintenance fees associated with the implementation of the plan.

24. In order to implement its MFP, Merrill Scott investors establish offshore entities in which they place assets and effect transactions. The main types of entities employed by Merrill Scott for its clients include International Business Corporations (IBCs) and Support Organizations (SOs).

25. Merrill Scott sales literature describes IBCs as corporations formed in a tax haven but not authorized to do business within that country. They are intended to be used as an investment or asset protection vehicle. The Merrill Scott investor transfers personal assets or an investment portfolio to the IBC.

26. Merrill Scott describes SOs as charitable organizations established for the benefit of an individual client. Among the stated benefits of an investor establishing an SO over using a domestic charitable organization is that investment funds transferred to the investor's personal SO can grow tax

free. These investment gains are available to the donor/investor through access to the offshore corporations that manage the investments of the SO.

27. Merrill Scott tells clients the offshore entities are not owned or controlled by the clients for tax purposes. Rather, nominee officers or directors act on behalf of the clients to control the entities and effect transactions. In fact, Merrill Scott personnel have authority to effect the transactions, with Brody retaining sole signatory authority over all accounts. Typically, in order to effect a transfer of funds, senior personnel at Gibraltar or Phoenix, such as Ross or Lipocantis, must authorize the transfer, which is then executed by Brody, using his signatory powers.

**Sales of Investment Products to Clients**

28. The types of investment products sold by Merrill Scott include Loss of Income Policies ("LOI"), Equity Management Mortgages ("EMM"), Foreign Variable Annuities ("FVA") and mutual funds managed by Phoenix.

### Loss of Income Policies and Equity Management Mortgages

29. MSA's web site describes an LOI as an agreement between the client and Gibraltar whereby the client purchases a policy to insure against a future loss of income:

> An LOI policy is usually purchased for coverage until the earlier of a specified term, such as 1 year, or the date of death of the insured . . . . The insurance company typically holds the net premium . . . in a separate account, along with the net premiums of other LOI insurance policies. Creditors cannot access policy reserves. The insurance company guarantees a fixed return on such premiums. . . . Most LOI policies provide that your premiums, plus a guaranteed return, will be paid back to the policy holder at the end of a specified period (usually 10 years).

30. The sales manual also states that investment decisions are made by the insurance company. The funds received by Gibraltar for the sale of LOIs are pooled in an account at Barclays Bank maintained by Gibraltar in the Bahamas.

31. In reality, LOIs are not purchased as insurance, but as a vehicle to make offshore and tax-free investments of funds which can be repatriated as desired by the investor. No Merrill Scott investor has ever filed a claim against an LOI for a loss of income. What, in fact, occurs is that the investor purchases the LOI from Gibraltar and then borrows back a percentage of the premium through a note or investment contract, usually in the form of a "mortgage," called an Equity Management Mortgage or EMM.

32. The EMM is obtained through two affiliated entities of Merrill Scott, Fidelity Funding and Legacy Capital, which act as the mortgagee. The investor's proceeds from the EMM are then placed in an IBC and invested offshore through Phoenix, or repatriated by the investor. The net effect of

the LOI/EMM transaction is that the investor is able to deduct the premium paid for the LOI, encumber his property through a mortgage to himself and deduct the interest payments to himself on the mortgage. The investor can then invest the proceeds from the mortgage offshore through an IBC, with Phoenix managing the investment. The remainder of the premium left with Gibraltar is then invested to provide the investor with a fixed rate of return over the ten-year life of the policy.

33. Contributions by investors to SOs are treated in a similar way. Under Merrill Scott's interpretation of the tax code, a certain percentage of the income derived from the funds contributed to the SO must be donated to charity, and the remainder may be loaned back to the investor through an EMM. The proceeds from the EMM are then invested in the same way as described in paragraph 32.

### Foreign Variable Annuities

34. The FVA is a variable annuity issued by Gibraltar. The investor purchases the FVA by transferring cash or securities to Gibraltar; Gibraltar then pays the investor or his designees the principal and an agreed upon rate of return over the succeeding years. Merrill Scott markets the FVA as a means to repatriate a client's assets without tax consequences. With respect to FVAs the MSA sales manual states:

> You could purchase a Foreign Variable Annuity Contract between you and a Foreign Insurer. During the accumulation period of the Annuity Contract you could set aside money and have it grow on a tax-deferred basis [pending] withdrawal. At retirement, or another time selected by you, the payout period begins whereby the insurance company promises to pay a steady stream of income for a fixed period of time or for life.

### "Mutual Funds"

35. Another investment opportunity offered to Merrill Scott investors are mutual funds managed by Phoenix. Formerly, Phoenix offered three separate funds to Merrill Scott investors. Of those three, however, the most popular was a fixed-income fund. The fixed income fund still exists but no purchases or sales into or out of the fund are currently taking place. The current value of that fund is purported to be $1.5 million.

36. Merrill Scott offered investors a mechanism to repatriate invested funds through what is referred to by Merrill Scott as a "Margin Fund." A MSA sales manual describes the Margin Fund as follows:

> An IBC may open a mutual fund account with Phoenix Overseas Advisors. Phoenix provides a margin line of credit at 9.5% interest rate. The IBC may simply borrow against its position in the funds up to 50% of the value of the fund. Access to the funds can be through the secured credit card. Finds can also be wired against the line of credit or

proceeds forwarded to a Nevada Corporation. This transaction is not reportable and not taxable.

37. Phoenix acts as an investment adviser, and is retained by the offshore entities established by the Merrill Scott investors to operate as such for their offshore assets. Phoenix receives the securities contributed by the investors to their offshore entities and places them in brokerage accounts controlled by Phoenix, usually with TD Evergreen, a Canadian broker dealer. 38 Phoenix is charged with managing the investor accounts and executing transactions on instructions provided by the Merrill Scott investors. Phoenix's fee for these services is approximately 1.5% of the funds it manages.

**THE FRAUD**

39. The Defendants are engaged in an ongoing fraud, the heart of which is the solicitation of investor funds through misrepresentations of material fact or omissions of material facts.

40. The misrepresentations made by the Defendants include:

a. The funds of MSA investors will be held in segregated accounts and will be held in trust on behalf of the investor.

b. That payments made to MSA investors are the proceeds of their own investment funds.

c. That the fees disclosed to MSA investors are the only funds used by the Defendants for their own purposes.

d. That even though the investor has, on paper, surrendered control of his assets to MSA, MSA investors will be able to direct the funds being held on their behalf offshore.

**The Ponzi Scheme**

41. The Merrill Scott organization has used newly invested client funds to pay principal and returns promised to earlier investors. Merrill Scott has not been able to honor its investors' demands for funds for repatriation or other from the assets contributed by investors because those funds no longer exist. As a result, Brody and others have used funds provided by new clients or from the sale of additional investments to existing clients to pay obligations to clients demanding promised returns.

42. The Merrill Scott organization has obtained funds to pay earlier investors by margining brokerage accounts in which clients' securities had been deposited and by simply liquidating funds maintained in accounts established by Gibraltar in connection with client purchases of LOIs and FVAs.

43. Internal communications among Merrill Scott employees discuss the payment of immediate obligations with new monies obtained from new clients. One internal Merrill Scott email, copied to Brody and Ross, states:

> [Y]ou are proposing somewhat of a Peter/Paul scheme that funds one client from another's funds. I am not comfortable with that system until we all have a conversation about the ramifications of that type of payment. It is my understanding that up to $1 Million is coming in before the end of the month. It would seem to me that the funding should come from that source, not client payments against notes ultimately due SO Organizations.

44. Internal Merrill Scott emails also make reference to threatened lawsuits against Merrill Scott by its clients because of Merrill Scott's inability to meet its financial obligations due its clients.

**Investor Funds are Used for Brody's Personal Use**

45. Since at least 1999, Brody has misappropriated approximately $9.5 million of client funds for his personal use, utilizing his alter ego, Alex Jones. Ross and Licopantis, who control the funds maintained by Gibraltar and Phoenix, have assisted Brody in the conversion of investor funds for Brody's personal expenses.

46. Brody uses investor funds to pay for his extravagant lifestyle. Brody has boasted to a Merrill Scott associate that "I own nothing but live like a king." As evidence of that maxim, Brody writes checks on corporate accounts to "cash" and uses the funds for personal expenses.

47. To pay his personal expenses, Brody has simply taken the funds, after having been authorized by Ross or Licopantis in many cases, from accounts maintained on behalf of clients over which he had signature authority.

48. Brody has used these funds to furnish a home, purchase art and on extravagant travel. Brody has also used client funds to lease expensive cars for Brody and his wife.

49. In response to objections to this conduct from associates at Merrill Scott concerning his appropriation of client funds, Brody stated Merrill Scott was his company, the funds coming to Merrill Scott were his, and that Brody could do whatever he wanted with the funds.

**Investor Funds Have Been Used for Speculative Purposes**

50. Brody has also used investor funds to purchase speculative securities, often to purchase stock in small, start-up companies.

51. Investors have not authorized the purchase of these speculative securities, and, in fact, have sometimes not been denominated as the owner of the securities once they are purchased.

52. Brody recently stated that he planned to use new funds recently obtained by Merrill Scott to purchase stock in a pre-IPO company because he believed the investment would result in significant returns when the company conducts its IPO.

**Investor Funds Have Been Used to Pay MSAI Operating Expenses**

Case 1:06-mc-00032-RMU   Document 12-4   Filed 07/31/2007   Page 11 of 17

Complaint: SEC v. Merrill Scott & Associates, Ltd., et al.   Page 10 of 16

53. Client funds have also been used to cover MSAI's operating expenses. MSAI has operated at a loss for several years, and Brody and others have used funds in client accounts to cover operating expenses.

54. According to MSAI's financial statements for the year ended December 31, 1999, MSAI's income for the year was $2.24 million while its expenses totaled $4.77 million.

55. In order to help fund MSAI's operational losses, POA loaned MSAI $1.5 million and GPA loaned $125,000.

56. For the years 2000 and 2001, MSAI's books reflect as paid-in-capital from Alex Jones, funds taken from Gibraltar and Phoenix to cover MSAI's losses. Brody has caused various persons with authority over client funds, including Ross and Licopantis, to authorize the withdrawal of funds from accounts maintained on behalf of clients and loan the funds to the Merrill Scott organization to cover operating expenses.

57. In recent months, in order for MSA to meet its payroll and other obligations, Brody, Ross and others margined securities maintained on behalf of Merrill Scott clients in accounts with a brokerage firm. The funds obtained from the margin transactions were then used to pay the obligations.

58. In addition, funds deposited in accounts maintained by Gibraltar on behalf of Merrill Scott clients were simply withdrawn from those accounts to meet similar obligations. Under those clients' MFPs, the funds were to be used for the benefit of the clients pursuant to the plans' instructions, not to pay Merrill Scott's obligations.

59. Brody and Ross have told employees that the client funds were merely being borrowed by Merrill Scott to pay expenses and would be repaid to its clients.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

60. The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 59 above.

61. From in or about 1998 through the present, the defendants, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, have: (1) employed, and are about to employ, devices, schemes and artifices to defraud; (2) made, and are about to make, untrue statements of material fact, or have omitted, and are about to omit, to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaged, and are about to engage, in acts,

Case 1:06-mc-00032-RMU Document 12-4 Filed 07/31/2007 Page 12 of 17

Complaint: SEC v. Merrill Scott & Associates, Ltd., et al. Page 11 of 16

transactions, practices and courses of business which have operated as a fraud or deceit upon purchasers of the securities and other persons.

62. By reason of the foregoing, the Defendants, have, directly or indirectly, singly or in concert, violated, and unless temporarily, preliminarily and permanently restrained and enjoined, will again violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

### SECOND CLAIM FOR RELIEF

### (Violations of Securities Act Section 17(a)(1))

63. The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 59 above.

64. Defendants, with scienter, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or by the use of the mails, directly or indirectly employed, and are employing, devices, schemes or artifices to defraud in violation of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)].

65. By reason of the foregoing, Defendants have, directly or indirectly, singly or in concert, violated, and unless temporarily, preliminarily and permanently restrained and enjoined, will again violate Section 17(a)(1) of the Securities Act and unless restrained and enjoined will continue to do so.

### THIRD CLAIM FOR RELIEF

### [Violations of Securities Act, Section 17(a)(2) and (3)]

66. The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 59 above.

67. Defendants, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or by the use of the mails, directly or indirectly (a) obtained and are obtaining money or property by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (b) engaged and are engaging in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities in violation of Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)].

68. By reason of the foregoing, Defendants have, directly or indirectly, singly or in concert, violated, and unless temporarily, preliminarily and permanently restrained and enjoined, will again violate Section 17(a)(2) and (3) of the Securities Act and unless restrained and enjoined will continue to do so.

### FOURTH CLAIM FOR RELIEF

### [Violations of Advisers Act, Sections 206(1) and (2)]

Case 1:06-mc-00032-RMU    Document 12-4    Filed 07/31/2007    Page 13 of 17

Complaint: SEC v. Merrill Scott & Associates, Ltd., et al.    Page 12 of 16

69. The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 59 above.

70. MSAI, Phoenix and Brody from at least 1998 engaged, for compensation, in the business of advising others as to the value of certain securities, or as to the adviseability of investing in, purchasing or selling certain securities. Consequently, MSA, MSAI and Brody were investment advisers.

71. As described in paragraphs 1 through 59, MSAI, Phoenix and Brody, directly or indirectly: (1) employed devices, schemes, or artifices to defraud clients or prospective clients; and (2) engaged in transactions, practices or courses of business which operated as a fraud or deceit upon clients or prospective clients.

72. Consequently, MSAI, Phoenix and Brody violated, and unless temporarily, preliminarily and permanently restrained and enjoined, will again violate Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and (2), and unless restrained and enjoined will continue to do so.

### FIFTH CLAIM FOR RELIEF

### (Aiding and Abetting Violations of Advisers Act)

73. The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 59 above.

74. As described above in paragraphs 1 through 59, Ross and Licopantis were aware that investors were told that securities would be purchased for them. Licopantis managed the assets of Phoenix and authorized Brody to transfer client funds, knowing that he would misappropriate the funds or use them in a manner other than represented to investors. Similarly, Ross authorized Brody to transfer investor assets from Phoenix to Brody knowing that Brody would misappropriate those funds or use them in a manner other than represented to investors.

75. Ross and Licopantis aided and abetted conduct by MSAI, Phoenix and Brody which, directly or indirectly: (1) employed devices, schemes, or artifices to defraud clients or prospective clients; and (2) engaged in transactions, practices or courses of business which operated as a fraud or deceit upon clients or prospective clients.

76. Consequently, Licopantis and Ross aided and abetted, and unless temporarily, preliminarily and permanently restrained and enjoined, will again violate Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and (2), and unless restrained and enjoined will continue to do so

### SIXTH CLAIM FOR RELIEF

### (Violations of Exchange Act, Section 15(a))

77. The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 59 above.

Case 1:06-mc-00032-RMU   Document 12-4   Filed 07/31/2007   Page 14 of 17

Complaint: SEC v. Merrill Scott & Associates, Ltd., et al.   Page 13 of 16

78. As part of their regular course of business, MSA, MSAI and Brody solicited investors to purchase securities, were involved in negotiations between issuers and investors, and received compensation related to the purchase of securities. Therefore, MSA, MSAI and Brody were acting as brokers.

79. Neither MSA nor MSAI has been registered with the Commission as a broker. Brody has not been associated with a broker or dealer registered with the Commission.

80. The activities of MSA, MSAI and Brody violated the registration provisions of Section 15(a)(1) of the Exchange Act, which requires that all brokers register with the Commission.

### RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this court:

I.

Enter an Order temporarily restraining and preliminarily enjoining: **(A)** MSA, MSAI, Phoenix, Gibraltar, Brody, and Ross, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, **(B)** MSA, MSAI and Brody, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a), and **(C)** MSAI, Phoenix and Brody, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and (2), and **(D)** Ross, his agents, servants, employees, attorneys, and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from aiding and abetting future violations of Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and (2).

II.

Grant a Final Judgment permanently enjoining: **(A)** MSA, MSAI, Phoenix, Gibraltar, Brody, Ross and Licopantis, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, **(B)** MSA, MSAI and Brody, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future

violations of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a), and **(C)** MSAI, Phoenix and Brody, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and (2), and **(D)** Ross and Licopantis, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from aiding and abetting future violations of Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and (2).

III.

Grant a Final Judgment requiring Defendants MSA, MSAI, Phoenix, Gibraltar, and Brody to disgorge an amount equal to the funds and securities they obtained illegally as a result of the violations alleged herein, plus prejudgment interest on that amount.

IV.

Grant a Final Judgment assessing penalties against the Defendants pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), and Section 209 (e) of the Advisers Act, 15 U.S.C. §80b-9(e).

V.

Issue an order directing MSA, MSAI, Phoenix, Gibraltar and Brody, jointly and severally, to prepare and present to the Court and the Commission, within thirty (30) days from the entry of said order, a sworn accounting of all of the proceeds collected by the defendants from the activities described in the Commission's Complaint.

VI.

Issue in a form consistent with Rule 65(e) of the Federal Rules of Civil Procedure, orders preliminarily and permanently enjoining defendants MSA, MSAI, Phoenix, Gibraltar, Brody, and Ross, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the orders by personal service or otherwise, and each of them, from:

A. transferring, changing, wasting, dissipating, converting, concealing or otherwise disposing of, in any manner, any funds, assets, claims, or other property or assets owned or controlled by, or in the possession or custody of such defendants or ;

B. transferring, assigning, selling, hypothecating, or otherwise disposing of any assets of as of the date of the Order.

C. directing them to:

1. take such steps as are necessary to repatriate to the territory of the

United States of America, in a manner directed by the Court, all funds and assets of investors in MSA, MSAI, Phoenix or Gibraltar, or any affiliated entity, which are held under their direct or indirect control, jointly or singly; and

2. provide the Commission and the Court a written specification of the funds and assets so repatriated;

3. submit in writing to the Court and to the Commission, within two business days following service of the Order:

(a) an accounting of all securities, funds, and other assets held in their names or for their direct or indirect benefit, stating the location of the funds and assets;

(b) an identification of each account with any financial institution (including banks and securities and commodities brokerage firms) maintained in their names or held for their direct or indirect benefit; and

(c) information identifying all business and residence addresses, postal box numbers, telephone numbers and facsimile numbers.

### VII.

Issue in a form consistent with Rule 65(e) of the Federal Rules of Civil Procedure, orders preliminarily and permanently enjoining the defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the orders by personal service or otherwise, and each of them, from destroying, mutilating, concealing, transferring, altering, or otherwise disposing of, in any manner, any books, records, computer programs, computer files, computer printouts, correspondence, memoranda, brochures, or any other documents of any kind, pertaining in any manner to the business of the defendants, including, without limitation, the sale of securities.

### VIII.

Grant such other and further relief as this Court may determine to be just, equitable and necessary, including, but not limited to, (i) a freeze of assets, (ii) the acceleration of discovery including the forthwith production of books and records, (iii) the appointment of a receiver, (iv) an order requiring repatriation of assets, and (v) an order requiring the execution of consent directives.

### IX.

Retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

### X.

Grant such other and further relief as the Court may deem just and equitable.

Dated: January 15, 2002

          Respectfully Submitted,

          s/Thomas M. Melton
          Thomas M. Melton
          William B. McKean
          ATTORNEYS FOR PLAINTIFF
          SECURITIES AND EXCHANGE

          COMMISSION

*http://www.sec.gov/litigation/complaints/complr17316.htm*

Home | Previous Page           Modified: 01/16/2002